IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| ROXIE LEMOND, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) |
| CITY OF CHICAGO, CARLA R. JACKSON, VIRGINIA DROZD, THERESA WILLIAMS, LYLE MYERS, DANIEL DUGAN, and, GARY H. YAMASHIROYA, | ) ) ) ) ) ) ) |
| Defendants. | ) |

Case No. 04 C 5888

HONORABLE CHARLES R. NORGLE

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court is Defendants' Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the court grants Defendants' Motion for Summary Judgment.

**I. BACKGROUND[1]**

**A. Facts**

*1. The parties and the Collective Bargaining Agreement*

This case arises out of Plaintiff Roxie Lemond's employment termination from the Chicago Police Department (the "Department"). Plaintiff Roxie Lemond ("Lemond") worked as a probationary police officer ("PPO") with the Department from April 29, 2002 until her termination on October 7, 2003. The Department is a division within Defendant City of Chicago

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and notes disputed facts within the text.

1

(the "City"). See http://egov.cityofchicago.org/city (visited 3/28/06).

On April 16, 2002, the Department and the Fraternal Order of Police Lodge No. 7 adopted a new Collective Bargaining Agreement ("CBA"). This new CBA was the result of three-year long negotiations, which resulted in the extension of the probationary period for PPO's from 12 to 18 months. During these six additional months, PPOs were classified as at-will employees, and therefore could be terminated without just cause. After the completion of the 18 month probationary period, the PPOs became full police officers, and could only be fired for just cause as provided for in Section 8.1 of the CBA. In addition, during the extension of their probationary status, the parties negotiated that PPOs would receive financial benefits as well as holiday leave, disability, overtime, and health care benefits. According to the City, the additional six months of probationary status was expressly negotiated for by the parties.

### 2. *Lemond's Employment at the Department*

Soon after Lemond began her employment with the Department, she filled out various forms that indicated her status as an at-will employee. Specifically, Lemond read and signed the Recruit Form Checklist which reads: "Chicago Police Department Notice to Probationary Police Officers." The final paragraph of this form states that "a probationary police officer is an at-will employee and may be terminated at any time with or without notice, for any reason. I acknowledge that I will comply with the above notice to probationary police officers." Additionally, Lemond received and signed the At-Will Employee Notice form which states that "a Probationary Police Officer is an at-will employee and may be terminated at any time, with or without notice, for any reason." Lemond received other forms such as the Basic Recruit Procedure Manual, the Department Glossary of Terms, the Department Rules and Regulations,

the Field Training and Evaluation Program manual, and a memorandum addressed to her regarding the receipt of these documents. Each of these forms clearly states that PPOs are considered at-will employees.

After Lemond confirmed her receipt of these documents, she began her field training as part of the Field Training and Evaluation Program. This program consists of three cycles, each lasting four weeks. Lemond's first cycle was from December 6, 2002 to January 2, 2003. The second cycle ran from January 3, 2003 through January 30, 2003, and the last cycle lasted from January 31, 2003 through February 27, 2003. During the field training phase, PPOs are designated to a district where a Field Training Officer ("FTO") trains and evaluates the PPO's progress. FTOs are told at the Police Academy that PPOs are at-will employees.

Lemond's training courses were all conducted in the 12th District. According to the City, the first cycle is an "acclimation period" and therefore any harsh criticism of a PPO is not taken seriously. At the end of her first training cycle, Lemond's FTO, Officer Twarowski filled out a Training Cycle Summary Report, which Lemond signed. She did not receive any poor marks in the first training cycle.

After Lemond's second training cycle, FTO Guzman filled out a Training Cycle Summary Report. FTO Guzman later stated that he felt Lemond had performed poorly, but did not want to give her the scores she really deserved, because the FTO in the first cycle gave her all high marks. FTO Guzman further stated that Lemond did not know the streets of the 12th District, and could not "figure out" how to get to an assignment. Additionally, Guzman reported that Lemond never initiated any vehicle stops, and it appeared to him that Lemond would do the minimum requirements to get by. According to Guzman, other problems with Lemond's conduct

included parking too far away from a vehicle she stopped, failing to ask for the driver's license and insurance, and failing to inform the driver why he was stopped. Guzman discussed these problems with Lemond, who acknowledged her need for improvement.

The FTO assigned to Lemond for her third training cycle was FTO June Olsen ("Olsen"). During her third cycle, Lemond received and signed Daily Observation Reports ("DORs") regarding her performance. According to Lemond, she had approximately eight days of training under Olsen in her third training cycle.

Then, between March 23 through April 29, 2003, Lemond was detailed to a traffic unit for the next stage of her training. After her completion of her traffic unit training, Lemond went on a 20 day furlough. Upon her return, Lemond was assigned to the 13th District to complete a refresher training course. Officer Carla Jackson ("Jackson") was Lemond's Field Training Officer for this two-week period. According to the Department, refresher training usually lasts two weeks. Lemond, however, had two refresher courses for a total of four weeks. The Department kept track of Lemond's progress in the form of Daily PPO Refresher Training Reports. Lemond would receive a copy of this report daily, and review and sign it after a discussion with Jackson. In the reports between May 29, 2003 and June 17, 2003, Jackson indicated that Lemond required additional training in her written communication. Jackson stated that Lemond took an excessive amount of time to fill out a case report for Retail Theft, although she did a similar report two days previously.

Additionally, Jackson's Reports between June 1 and June 13, 2003 indicated that Lemond required more training in vehicle operation. Specifically, Jackson found that Lemond was unable to drive and watch the streets simultaneously, and at times had difficulty focusing. According to

4

Jackson, when Lemond drove with emergency lights and sirens, she appeared nervous and not quite herself.

Then, on June 25, 2003, at the end of Lemond's Refresher Training, Jackson drafted another Refresher Training Cycle Summary Report. The Report indicated that Lemond needed extra training in vehicle operations, written communication, community interaction, arrest procedures, and physical skills and force. Specifically, the Report indicated that Lemond appeared to have trouble focusing on tasks, would not take the initiative on any assignments, and at one point walked away from a car in the middle of a traffic stop, while Jackson questioned the driver. Finally, Jackson informed Lemond that she requested a Review Board to review Lemond's performance.

On June 25, Lemond received a letter informing her that the Review Board was going to look into her overall performance. Additionally, Lemond was informed that she could submit a written statement to the Review Board by July 7, 2003, which she failed to do. Then, on July 8, 2003, the Review Board convened to evaluate Lemond's performance. The Board reviewed Lemond's three training cycles, her Refresher Cycle Evaluations and Summary Report, her extended Refresher Cycle Evaluations and Summary Report, and the Request for a Field Training and Evaluation Review Board. At the end of the review, the Board unanimously recommended that Lemond complete a Remedial training cycle in the 6th District from July 16, 2003 through August 12, 2003. The Review Board further found that Lemond appeared to have forgotten many of the skills she should have learned in the initial phases of her police training. Defendant Lt. Virginia Drozd ("Drozd") voted for a remedial cycle instead of termination, in order to give Lemond the opportunity to have more training.

Then, from July 13 to August 9, 2003, Lemond was assigned to the 6th District for her remedial training, in part because it is a South-Side district, and Lemond indicated that she would be more comfortable in such a location. Her supervisor in the 6th District was FTO James Nichols ("Nichols"). Nichols stated that Lemond should have been ahead of other PPOs, given the amount of training she had before this remedial cycle. Furthermore, when Nichols drafted his DOR for Lemond, he did not take into account her previous experience, he evaluated her as only a third cycle PPO, and not someone who already completed her third cycle and two refresher courses.

Upon completion of her remedial cycle, Lemond was assigned to Unit 353, the Enhanced Foot Patrol Unit. Lemond was scheduled to report for training on August 10, 2003, however she failed to arrive on that date. After some initial confusion between Lemond and Lt. Lyle Myers ("Myers"), the commanding officer at Unit 353, Lemond began her training with FTO Ronald Baez ("Baez"). Baez completed Training Mission Daily Observations Reports on Lemond, which were available for her review. Baez's reports stated that he was concerned with Lemond's training, and her lack of knowledge of police procedure. He also felt Lemond was constantly confused, lacked safety concerns, and stated that Lemond failed to turn in paperwork on time. Specifically, Baez stated that Lemond even turned her back on individuals during traffic stops.

Then, on September 11, 2003, Lemond received a notice to report to the Academy, and that a second Review Board would be held to review her performance and make recommendations on Lemond's continued employment with the Department. Lemond was able to submit a written statement by September 23, 2003, and instead submitted her statement on September 25. That same day, the Review Board convened a second time in regards to

Lemond's performance. The Review Board evaluated Lemond's file, and unanimously agreed to terminate Lemond's employment with the Department. According to the City, this recommendation was based on the Review Board's finding that Lemond "demonstrated a failure to perform safely." The Review Board found that Lemond lacked knowledge of Department policy and procedure, and lacked respect for authority, including the Chain of Command.

On October 7, 2003, Lemond received a letter from the Commander of the Department's Personnel Department, terminating her employment. Additionally, Lemond received a letter from Commander Gary Yamashiroya ("Yamashiroya") which outlined the procedures for issuing a termination letter. According to the City, Lemond did not file any grievances with the Department. Lemond alleges that when she spoke with a Sergeant at Police Headquarters, he informed her that she was not covered by the CBA. Lemond made no further efforts to file a grievance with the Department.

## B. Procedural History

On September 9, 2004, Lemond filed her initial complaint. Then, on October 25, 2004, she filed a four-count Amended Complaint alleging a deprivation of her property rights without procedural due process, pursuant to 42 U.S.C. § 1983, a conspiracy to deprive her of these rights, that Defendants tortiously interfered with Lemond's prospective business advantage, and a claim for indemnification against the City. On March 9, 2005, the court granted Defendants' Motion to Dismiss the conspiracy claim. Then, on December 30, 2005, Defendants filed their Motion for Summary Judgment on the remaining counts. Lemond filed her Response on February 17, 2006, and Lemond Replied on March 24, 2006. Defendants' Motion for Summary Judgment is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v.

Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d. 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

## B. The Applicable Law

### 1. 42 U.S.C. § 1983

Count One of Lemond's claim alleges a deprivation of procedural due process pursuant to 42 U.S.C § 1983. Lemond alleges that the Defendants, "while action under color of law and within the scope of their employment... were willful and acted in reckless disregard for Plaintiff's rights to procedural due process under the United States Constitution as secured by 42 U.S.C. § 1983." Am. Compl., ¶¶ 53, 56. "In order to state a claim under Section 1983, a plaintiff must allege that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law." Lekas v. Briley, 405 F.3d 602, 606 (7th Cir. 2005) (quoting Brokaw v. Mercer County, 235 F.3d 1000, 1009 (7th Cir. 2000)). The protections of the procedural due process clause will "only be triggered if state action implicates a constitutionally protected interest in life, liberty, or property." Id. (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 570-71 (1972)). Therefore, it "follows that a plaintiff cannot under Section 1983 complain of procedural due process violations unless the state has first deprived him or her of such a constitutionally

9

protected interest." Lekas, 405 F.3d at 607 (quoting Kentucky Dept. of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).

In order to prevail on a procedural due process claim, Lemond must "demonstrate: (1) that the defendants deprived her of a property interest, and (2) that the deprivation occurred without due process." Brooks v. Univ. of Wisconsin Bd. of Regents, 406 F.3d 476, 481 (7th Cir. 2005). A constitutionally "protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract." Crull v. Sunderman, 384 F.3d 453, 460 (7th Cir. 2004); see Roth, 408 U.S. at 577. In the employment context, "property interests arise in two ways: (1) by an independent source such as state law securing certain benefits, or (2) by a clearly implied promise of continued employment." Crull, 384 F.3d at 460 (quoting Heck v. City of Freeport, 985 F.2d 270, 273 (7th Cir. 1996)). Therefore, because Lemond was employed in Illinois, "we must examine Illinois law to determine if she had a property interest in her employment with the [Department]." Id., see Bishop v. Wood, 426 U.S. 341, 344 (1976) ("The sufficiency of [a] claim of entitlement must be decided by reference to state law").

*2. Illinois Law*

Illinois law provides, in part, "In any municipality of more than 500,000 population, no officer... of the police department... whose appointment has become complete may be removed or discharged... except for cause upon written charges and after an opportunity to be heard in his own defense by the Police Board." 65 ILL. COMP. STAT. 5/10-1-18.1. The Illinois Supreme Court has held that this statute "does not extend to probationary officers, because until they have completed their probationary term, they have not been 'appointed' in the manner contemplated

by the statute." Romanik v. Bd. of Fire and Police Commissioners of East St. Louis, 61 Ill.2d 422, 425 (Ill. 1975); see Beazley v. Wosik, 119 Ill.2d 437, 440 (Ill. 1988) ("[A] probationary police officer may be discharged without a hearing"). Furthermore, in Illinois, "at-will employees may generally be discharged for any reason or no reason at all." Pantoja v. Holland Motor Exp., Inc., 965 F.2d 323, 329 (7th Cir. 1992); see Phelan v. City of Chicago, 347 F.3d 679, 682 (7th Cir. 2003).

With these principles in mind, we turn to Lemond's claims.

## C. Lemond's At-Will Employment

### *1. Lemond did not possess a property interested in her employment*

Based on the evidence in the record, the court finds that Lemond was an at-will employee during her PPO status, and as a result, did not have a property interest in her employment with the Department.[2] In order for Lemond to prevail on her procedural due process claim, she must first establish that "the defendant deprived [her] of a property interest." Brooks, 406 F.3d at 481. However, Illinois statutory law and the Illinois Supreme Court expressly state that probationary officers are considered at-will employees, and therefore may be discharged without a formal hearing, and for any reason at all. See 65 ILL. COMP. STAT. 5/10-1-18.1; Romanik, 61 Ill.2d at 425. Therefore, existing Illinois law does not create a property interest in continued employment in the Department for officers who are on probationary status. See Ulichny v. Merton Comm. School Dist., 249 F.3d 686, 700 (7th Cir. 2001) ("federal property interests usually arise from rights created by state statutes. . . .").

---

[2]The court notes that Defendants raise the issue of Arbitration, as found in Appendix P of the CBA. However, the court will analyze the Motion for Summary Judgment in light of Lemond's at-will status and Illinois law.

11

Additionally, Lemond cannot state that any constitutionally protected property interest in her employment was "implied from the [Department's] words and conduct in the light of the surrounding circumstances." Id. (citing Perry v. Sindermann, 408 U.S. 593, 601 (1972)). The record demonstrates that Lemond was aware that she was an at-will employee from her first day at the Academy. She signed various documents, all which expressly stated that PPOs were at-will employees. Lemond cannot now allege that she had an expectation to future employment, when no such promise was ever contemplated by the parties.

Moreover, because Lemond was an at-will employee, the Department had no duty to give a reason for her termination, or provide her with a hearing on the matter. See Phelan, 347 F.3d at 682. Even if Lemond was protected by the Just Cause standard of Section 8.1 of the CBA, the Department has sufficient evidence to terminate Lemond's employment.

### 2. *Evidence of Lemond's Misconduct*

The record is replete with documents and statements by officers as to Lemond's poor work ethic and various behavioral problems noted by the FTOs. For example, FTO Guzman observed that Lemond did not know the streets of the 12th District and could not "figure out" how to get to an assignment. According to Guzman, Lemond never initiated traffic stops, and did not know the correct procedure to conduct such a stop. FTO Jackson also believed that Lemond needed to relax when driving police vehicles, and observe basic rules of the road, such as utilizing turn blinkers. In one instance, Lemond responded to a dispatch call, yet she did not know where Ashland Ave. and Wood St. were located. Furthermore, Lemond was unable to locate a business on the 1600 block of Chicago Avenue, despite a large sign with the street address hanging on the building's facade.

Perhaps the most egregious examples of Lemond's inability to follow procedure concern her safety habits. Several Daily PPO Refresher Training Reports stated that Lemond was not detailed enough in conducting searches, did not search prisoners properly, and could not direct traffic at an intersection. In once instance, after Lemond completed a search, crack bag was found on a female prisoner upon entry into the Ladies lockup. During a stop and pat down of individuals, Lemond received a phone call and turned her back on the men in the middle of the procedure.

Despite these various infractions and missteps, the Department held a Review Board and decided to give Lemond refresher training. After she unsuccessfully completed this training, the second Review Board decided to terminate Lemond's employment. The Board afforded Lemond an opportunity to submit a written response to the Review board, explaining her situation. Lemond failed to do so for the first Review Board.

The facts in the record depict Lemond as a less than diligent PPO. Lemond does not "deny much of the conduct described in the numerous evaluations and documents provided by the [Department]." Hall v. Gary Comm. Sch. Corp., 298 F.3d 672, 676 (7th Cir. 2002). The Department gave Lemond several opportunities to amend her conduct and conform to the standards expected of PPOs. Even though Lemond was not entitled to any due process, the fact that the Department held two Review Boards, in addition to two refresher courses demonstrates their willingness to work with Lemond. Even if Lemond was covered by the Just Cause standard of the CBA, the Department has submitted competent evidence that demonstrates it would meet this standard as well.

Because Lemond cannot establish that she had a constitutionally protected right to continued employment with the Department, she also cannot establish that "that the deprivation occurred without due process." Brooks, 406 F.3d at 481. As a result, Lemond cannot submit any facts that would create a genuine issue of material fact as to whether she had a constitutionally protected property interest in her employment. See Szymanski, 231 F.3d at 364.

## D. REMAINING STATE CLAIMS

Because summary judgment is granted in favor of the City on the § 1983 claim, the court relinquishes jurisdiction on Lemond's remaining state court claims.

## III. CONCLUSION

For the foregoing reasons, the court grants Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 3-29-06